1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS LE'BARRON GRAY, ) | CASE NO. 1:10-cv-00357 LJO  GSA PC |
|            Plaintiff, ) | FINDINGS AND RECOMMENDATIONS RE |
|   ) | DEFENDANT'S MOTION FOR SUMMARY |
|    v. ) | JUDGMENT    (ECF No.  34) |
|   ) | |
| DR. ULIT, ) | OBJECTIONS DUE IN THIRTY DAYS |
|   ) | |
|           Defendant. ) | |

        Plaintiff  is a state prisoner proceeding pro se and in forma pauperis in this civil rights action

pursuant to 42 U.S.C. § 1983.  This proceeding was referred to this court by Local Rule 302 pursuant

to 28 U.S.C. § 636(b)(1).  Pending before the Court is Defendant's motion for summary judgment.

Plaintiff has opposed the motion.

**I.      Procedural History**

        This action proceeds on the December 20, 2010, first amended complaint filed in response

to an earlier order dismissing the original complaint with leave to amend.  Plaintiff, an inmate in the

custody of the California Department of Corrections and Rehabilitation (CDCR) at the California

Men's Colony in San Luis Obispo, brings this civil rights action against Wayne Ulit, a physician

employed by the CDCR at Corcoran State Prison and an unidentified Appeals Coordinator.  The

1   events that give rise to this lawsuit occurred while Plaintiff was housed at Corcoran State Prison.[1]

2   Plaintiff alleges that from April 2, 2008, to June 17, 2008, Dr. Ulit was deliberately

3   indifferent to his medical needs.   Specifically, Plaintiff alleges that on April 13, 2008, he filed an

4   emergency appeal, seeking treatment for "visual problems." (Compl. ¶ IV.)  On June 5, 2008, in

5   response to the grievance, Dr. Ulit indicated that Plaintiff needed emergency treatment.  The next

6   day, Plaintiff was seen by an eye specialist and diagnosed with a retinal tear in his left eye.  Id.  On

7   June 11, 2008, "Chief Medical Staff" at Corcoran approved Plaintiff for treatment at an outside

8   hospital.  On June 17, 2008, Plaintiff was sent to Community Medical Center in Fresno, and

9   underwent laser surgery to repair the tear.  Id.

10   Defendant filed a response to the complaint, and on January 11, 2012, filed the motion for

11   summary judgment that is before the Court.  Plaintiff filed opposition to the motion on February 23,

12   2012.[2]

13   **II.    Summary Judgment Standard**

14   Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

15   as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

16   Civ. P. 56(c).   Under summary judgment practice, the moving party

17   [a]lways bears the initial responsibility of informing the district court
    of the basis for its motion, and identifying those portions of "the
18   pleadings, depositions, answers to interrogatories, and admissions on
    file, together with the affidavits, if any," which it believes
19   demonstrate the absence of a genuine issue of material fact.

20   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

21   If the moving party meets its initial responsibility, the burden then shifts to the opposing

22   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

23   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

24   

25   _____

26   [1] On February 4, 2011, an order was entered by the District Court, adopting the findings and
    recommendations of the magistrate judge, dismissing the Appeals Coordinator for failure to state a claim.

27   

28   [2]On January 5, 2011, the Court sent to Plaintiff the summary judgment notice required by Rand v. Rowland,
    154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (ECF No. 14.)

of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56©). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

1   trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

2   **III.   Eight Amendment**

3       In order to prevail on a § 1983 claim for violation of the Eighth Amendment based on

4   inadequate medical care, a plaintiff must show "acts or omissions sufficiently harmful to evidence

5   deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

6   Plaintiff must show both that his medical needs were objectively serious, and that defendants

7   possessed a sufficiently culpable state of mind. Wilson v. Seiter, 111 S.Ct. 2321, 2323 (1991).

8       The requisite state of mind for a medical claim is "deliberate indifference." Hudson v.

9   McMillian, 112 S.Ct. 995, 998 (1992); Wilson, 111 S.Ct. at 2323. Deliberate indifference is present

10  "when prison officials deny, delay or intentionally interfere with medical treatment," or it may be

11  shown "by the way . . . prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050,

12  1059 (9th Cir. 1992) (cites omitted). While neither negligence nor medical malpractice is sufficient

13  to violate the Eighth Amendment, a plaintiff is not required to show a complete failure to provide

14  medical treatment. Rather, "deliberate indifference" may be shown by conduct amounting to a total

15  failure to competently treat a serious medical condition, even if some treatment is prescribed. See,

16  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).

17  **IV.   Defendant's Motion**

18      Defendant supports his motion with his own declaration, along with copies of relevant

19  portions of Plaintiff's medical record.   Defendant is a licensed physician and surgeon in the State

20  of California, and is Board Certified in Internal Medicine. (Ulit Decl. ¶ 1.) Defendant's declaration

21  is based on his personal observation of Plaintiff, and a review of Plaintiff's medical record.

22  Regarding treatment for Plaintiff's eye, Defendant declares as follows.

23

24          On April 1, 2008, I examined GRAY because he had complaints of
    back pain which was on and off.  I noted that he needed Naproxen, a

25          pain reliever.  I further noted that GRAY had no numbness in his
    lower extremities, and his control of urination was good, meaning

26          GRAY had no nerve problems.  GRAY also had no history of ulcers,
    meaning Naproxen could be prescribed, and he had no allergies to

27          Aspirin.  I performed a physical examination of GRAY, and
    diagnosed GRAY with lower back pain.  I wrote an order for

28          Naproxen for GRAY, and also wrote an order for GRAY to follow up

4

with his primary care physician (PCP) in 90 days.

At no point during my April 1, 2008 examination of GRAY did GRAY indicate that he had any complaints regarding his left eye.

GRAY filled out a Health Care Services Request Form dated May 6, 2008 complaining of vision problems in his left eye.  In his request, GRAY stated that he had informed me of his vision problem  on April 2, 2008.  Registered Nurse M. Finnell evaluated GRAY on May 9, 2008, but he did not complain of any pain.  RN Finnell noted that GRAY was already scheduled for an ophthalmologist follow-up in June 2008.

I saw GRAY in the 3B Clinic on June 5, 2008 in regards to a 602 appeal he had filed.  During my examination of GRAY, I noted that he had come to see me on April 2, 2008, for his back pain but was now claiming he was losing his vision.  I further noted that GRAY had no present complaints of eye pain.   After my physical examination of GRAY, I diagnosed him with glaucoma and that he was claiming he was losing his vision.  I wrote an order for GRAY to go to the Emergency Room (ER) (at CSP-COR, this is also referred to as the Acute Care Hospital (ACH) or Triage and Treatment Area (TTA)) to be seen by an ophthalmologist for further evaluation because the ophthalmologist was in the ER that day.  I personally called the ER to advise them to get GRAY to the ophthalmologist and noted that the ER accepted GRAY.  I educated GRAY to take his glaucoma medications regularly and to follow up with his primary care physician in 60 days.

On June 5, 2008, after I sent GRAY to the ACH, he was evaluated by Dr. Sanchez.  GRAY's chief complaint was decreased vision in his left eye but denied any eye pain. Dr. Sanchez arranged for the ophthalmologist, Dr. Sofinksi, to see GRAY the following morning.

On June 6, 2008, GRAY was evaluated by Dr. Sofinski.   Dr. Sofinksi's impression was to rule out a retinal tear in GRAY's left eye, and end stage glaucoma in the right eye greater than the left.  Dr. Sofinski had a long discussion with GRAY about the risks and benefits of a retinal exam and possible laser surgery to strengthen the left retina.  Loss of vision, loss of eye and the need for future surgery was discussed.   Dr. Sofinski recommended an urgent retina consultation with Dr. Jack Clark and submitted a Health Care Services Physician Request for Services on June 6, 2008 for that consultation.

On June 11, 2008, GRAY was examined by me in the 3B Clinic.  I noted that GRAY had seen an ophthalmologist for his vision and that the ophthalmologist had recommended that GRAY see a retina specialist.  GRAY had no eye pain.  I diagnosed GRAY with rule out retinal tear, and end stage glaucoma in both eyes.  My plan was to refer GRAY to the retina doctor urgently, and for GRAY to follow up with the ophthalmologist in two weeks.  I wrote an order for GRAY to follow up with his primary care physician in 60 days and to follow up with Dr. Sofinski in two weeks.  I also submitted three Health

Care Services Physician Request for Services on behalf of GRAY, one for an urgent retina consultation with Dr. Clark, one for a routine optometry evaluation which was recommended by Dr. Sofinski, and one for a routine dietician consultation due to GRAY's high cholesterol.

On June 12, 2008, a Request for Authorization of Temporary Removal for Medical Treatment was completed on behalf of GRAY so that he could be seen by Dr. Jack Clark at UMC Eye Clinic in Fresno, California for his urgent consultation on June 17, 2008.

On June 17, 2008, GRAY was seen by Dr. Clark at UMC and GRAY reported no eye pain.  Dr. Clark performed laser surgery on GRAY's left eye.

On June 18, 2008, I wrote an order for a follow up appointment with the ophthalmologist for GRAY that week.  I also submitted two Health Care Services Physician Request for Services on behalf of GRAY, one for a routine ophthalmology procedure known as the Humphrey Visual Field (HVF) which was recommended by ophthalmology, and one for a routine optometry consultation which was also recommended by ophthalmology.   An order was also written on June 18, 2008 for GRAY to follow up with Dr. Clark at UMC on or about July 17, 2008.

On June 20, 2008, GRAY had a follow up appointment with Dr. Sofinski in the Ophthalmology Clinic, status post his laser surgery by Dr. Clark.  GRAY stated that he thought the laser did well to secure his retina, and that he reported fewer flashes and floaters in his left eye.  Dr. Sofinski's impression of status post laser to the retinal tear of GRAY's left eye was stable at present, and that GRAY's end stage glaucoma right eye greater than left eye was controlled.   Dr. Sofinski's plan was for GRAY to continue taking his glaucoma medications.  Dr. Sofinski wrote an order for glaucoma medications for GRAY and for GRAY to follow up in one month.

On July 10, 2008, GRAY had a follow up appointment with Dr. Sofinski in the Ophthalmology Clinic.  GRAY denied any decreased vision.  Dr. Sofinski's impression of GRAY was end stage glaucoma, stable at present on medications, and a successful laser surgery of the retinal tear of the left eye.  On July 11, 2008, Dr. Sofinski wrote an order for GRAY to continue his glaucoma medications and wrote an order for glaucoma medications for GRAY.  Dr. Sofinski also wrote an order for GRAY to follow up within one month.

Shortly after July 11, 2008, I reviewed a copy of Dr. Sofinski's orders where Dr. Sofinski had indicated for GRAY's primary care physician to write the order for GRAY's follow up.  On July 16, 2008, I wrote an order for GRAY to follow up with ophthalmology in one month.  On July 17, 2008, GRAY had a follow up with Dr. Clark at UMC.

On August 8, 2008, GRAY had a follow up with Dr. Sofinski in the Ophthalmology Clinic.  It was noted that the retinal tear in GRAY's left eye was lasered by Dr. Clark in June 2008.  GRAY reported no

change in vision in either eye.   Dr. Sofinski's impression was GRAY's end stage glaucoma was stable on medications, and the laser surgery of GRAY's retinal tear in his left eye was successful.  Dr. Sofinski wrote an order for glaucoma medications for GRAY, and for GRAY to follow up with ophthalmology in 6 months.

On September 17, 2008, GRAY was seen for his chronic care follow up visit for his glaucoma.  GRAY did not mention or have any reports of vision problems or eye pain.

On November 20, 2008, GRAY was seen by me for his chronic care follow up visit for his glaucoma.  GRAY was feeling good and stated that he had no complaints of eye pain.  GRAY was taking the eye drops and doing well.  GRAY did not mention or have any reports of vision problems.

(Ulit Decl. ¶¶ 4-22.)

        Dr. Ulit's declaration establishes the lack of existence of a triable issue of fact - evidence that he was not deliberately indifferent to a serious medical need of Plaintiff's.  Dr. Ulit's declaration establishes that the first time Plaintiff informed Defendant of vision problems in his left eye was June 5, 2008. Defendant, not an ophthalmologist, immediately referred Plaintiff to the ER, knowing that an ophthalmologist was available.   Defendant personally called the ER to make sure they accepted Plaintiff.  Dr. Ulit's declaration establishes that Plaintiff was evaluated by Dr. Sanchez in the ER on June 5, 2008, and by Dr. Sofinski in the Ophthalmology Clinic on June 6, 2008.  Plaintiff was seen again by Defendant on June 11, 2008, and Dr. Clark performed laser surgery on Plaintiff on June 17, 2008.  Dr. Ulit's declaration establishes that from the time Plaintiff first informed him of vision problems to the time that Dr. Clark performed laser surgery, only 12 days had passed.  Dr. Ulit has therefore come forward with evidence that establishes the lack of existence of a triable issue of fact.  Dr. Ulit's declaration establishes that his response to Plaintiff's vision problem was prompt and reasonable.   There is no evidence that Dr. Ulit acted with deliberate indifference toward Plaintiff's vision problem.   The burden now shifts to Plaintiff to come forward with a triable issue of fact as to whether Dr. Ulit was deliberately indifferent to a serious medical need of Plaintiff's.

///

///

///

V.   **Plaintiff's Opposition**

Plaintiff's opposition consists of a response to the motion for summary judgment, a statement of disputed material facts, and a declaration in support of Plaintiff's opposition. Attached to Plaintiff's declaration are exhibits 1 through 10.[3]

The Court has reviewed Plaintiff's exhibits 1 through 10 , as well as his opposition and first amended complaint. The only exhibits that refer to any conduct by Defendant Dr. Ulit are exhibits 2 and 8. Exhibit 2 is a copy of inmate grievance no. 08-2099, signed by Plaintiff on April 13, 2008. This grievance supports Plaintiff's declaration that he was seen by Dr. Ulit on April 1, 2008. During that visit, he informed Dr. Ulit that

> I was having problems that were identical to when I lost 60% of my vision in my right in 1989. Dr. Ulit's response that my next appointment with the ophthalmologist is in June 2008 and that I will have to wait until then. I plead with Dr. Ulit that all I need is a referral so that Dr. Sofinski will dilate my eye and see what the problem may be because what I was experiencing was similar to when I lost the vision in my right eye in 1989. Dr. Ulit decline to send me to ACH.

(Pla.'s Decl. ¶ 7.) Plaintiff filed an inmate grievance, seeking prompt treatment by an optometrist. Dr. Ulit's response, as noted above in the declaration of Dr. Ulit, is that he was seen and referred to the emergency room. As noted in Dr. Ulit's declaration, he noted no present complaints of eye pain during the June 5, 2008, visit. Although Plaintiff's exhibit 2 establishes a disputed fact as to whether he advised Dr. Ulit of his loss of vision during the April examination, it does not establish evidence that Dr. Ulit was aware of a serious threat to Plaintiff's health. Plaintiff's evidence establishes that he complained of the same condition that he had been diagnosed with in 1989, which was a loss of vision. Plaintiff's declaration and exhibit 2 do not establish that he made Dr. Ulit aware of an acute condition. Plaintiff's evidence does establish that Dr. Ulit responded to the grievance by sending Plaintiff to the ACH immediately, as there was an ophthalmologist present at the time. Plaintiff

---

[3] The first amended complaint is signed under penalty of perjury. A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(c)(4).

1   establishes, at most, a delay of approximately two months before he was seen by an eye specialist.

2       Mere delay in medical treatment does not constitute deliberate indifference.  Shapley v.

3   Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985).  A plaintiff must show the

4   delay caused him serious harm.  But see  McGuckin, supra at 1060 (plaintiff not required to show

5   "substantial harm").  In addition, a prisoner must show defendant knew aid was required, had the

6   ability to render that aid, yet "sat idly by."  Id.  In other words, deliberate indifference is a function

7   of the seriousness of prisoner plaintiff's medical needs and the wrongfulness of the defendant's

8   actions in light of those needs.  McGuckin, supra at 1061.    Plaintiff comes forward with no

9   evidence that any delay in referral to the ophthalmologist caused him further harm.  Whether

10  Plaintiff advised Dr. Ulit of his condition during the April examination is not material.

11      Plaintiff's Exhibit 8 is a copy of inmate grievance 08-17714, signed by Plaintiff on

12  November 24, 2008.  Plaintiff filed this grievance complaining of "medical negligence, that cause

13  direct pain and suffering to me from April 2, 2008, when I brought my medical concerns of lost of

14  vision in my left eye to Dr. Ulit attention to June 17, 2008 when I went "UMC Eye Clinic" Fresno,

15  California and treated by Dr. Jack Clark with lesser surgery for actual retina tear in my left eye."

16  Plaintiff also attaches the Director's Level response to his grievance.  Plaintiff's grievance was

17  denied.  The basis for the Director's Level Decision follows:

18
19          Your medical documentation has been fully reviewed and it was
            determined that you were diagnosed and suffering with end stage
            glaucoma.  This was impacting your vision.

20          You were seen by Dr. Ulit and he referred you to the Acute Care
21          Hospital for further evaluation.  It was determined that you should be
            seen by an ophthalmologist.  You underwent laser eye surgery on
            June 17, 2008, and it was deemed successful.
22
23          You have been seen for additional routine eye examinations and you
            had not mentioned any further problems or pain with regard to your
24          vision in either eye.

25          There was no evidence found to support your claims that Dr. Ulit
            treated you inappropriately or in a neglectful manner.

26          After review, there is no compelling evidence that warrants
27          intervention at the Director's Level of Review as your medical
            condition has been evaluated by licensed clinical staff and you are
            receiving treatment deemed medically necessary.
28

(Pla.'s Exh. 1, p. 6.)

Plaintiff offers this evidence to support his argument that Dr. Ulit's response to his condition was negligent. This evidence does not, however, establish that Dr. Ulit was aware of an objectively serious medical condition of Plaintiff's, and acted with deliberate indifference to it. Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.1980) (citing Estelle, 429 U.S. at 105-06). See also Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004). Plaintiff's evidence does not establish deliberate indifference.

In paragraph 10 of his declaration, Plaintiff indicates that he made Dr. Ulit aware of his condition on May 8, 2008, by submitting a Health Care Services Request form. Plaintiff's Exhibit 5 is a copy of that form. Plaintiff's specific complaint was that "I explain to Dr. Ulit that I have glaucoma and lost 60% vision in right eye and that I'm experiencing the same signs as to my eye (left) when I lost vision on my right. But I see my request wasn't taken seriously." The response by M. Finell, RN, indicated that, although Plaintiff was scheduled for an ophthalmology consult in June of 2008, a doctor would evaluate for a possible consult sooner. Finnell indicated that the request would be routine, indicating "next week if possible." As noted in Dr. Ulit's declaration, Plaintiff did not complain of any pain. The request, though deemed by Plaintiff an emergency, was designated as routine, and not urgent or an emergency.

In his declaration, Plaintiff indicated that during his visit to the 3B Medical Clinic on May 9, 2008, he complained of light flashes, headaches, and pressure behind his left eye. Plaintiff declares that "RN did not document my pain level and I did not notice this until had a Olsen review of my medical file." Plaintiff supports this paragraph with Exhibit 5. Although Plaintiff's declaration creates a disputed issue of fact regarding his pain level at the May 9, 2008, examination, there is no evidence that Dr. Ulit was aware of any acute condition of Plaintiff's, or any severe pain that Plaintiff suffered. Dr. Ulit did not see Plaintiff on that date, and Plaintiff's Exhibit 5, by Plaintiff's own declaration, does not indicate that Plaintiff was in any pain.

Plaintiff declares that when he was seen by Dr. Ulit on June 5, 2008, Dr. Ulit referred him

10

1   to the ACH.  At the ACH, Dr. Sanchez advised Plaintiff that the ophthalmologist was gone for the

2   day.  Plaintiff saw the ophthalmologist, Dr. Sofinski, the next day.  Dr. Sofinski advised Plaintiff that

3   he had a retinal tear and that Plaintiff's symptoms were due to the retinal tear.  Plaintiff was

4   scheduled to have laser surgery "as soon as possible," (Pla.'s decl., ¶ 15.)   On June 17, 2008,

5   Plaintiff underwent laser surgery on his left eye.  (Id. ¶ 17.)

6       Nothing in Plaintiff's declaration establishes that Dr. Ulit was deliberately indifferent to a

7   serious medical need of Plaintiff's, or that any conduct of Dr. Ulit's caused Plaintiff injury.

8   Plaintiff's evidence establishes that Dr. Ulit referred Plaintiff to an ophthalmologist, and Plaintiff

9   was eventually diagnosed with a retinal tear and treated.  Plaintiff's evidence establishes, at most,

10  a disputed issue of fact as to whether he told Dr. Ulit of his condition during his April examination.

11  As noted, however, it is immaterial whether Dr. Ulit knew of the condition in April.  There is no

12  evidence that any delay in treatment caused Plaintiff injury.

13  **VI.   Conclusion**

14      The gravamen of Plaintiff's complaint is that he had to wait until June 17, 2008, to undergo

15  laser surgery to correct a retinal tear.  In Plaintiff's view, Dr. Ulit should have been aware of that

16  exact condition when he saw Plaintiff in April.  There is no evidence to support that view.  Dr. Ulit's

17  declaration establishes that once he became aware of Plaintiff's condition, he referred Plaintiff for

18  an ophthalmological consult.  Even if Dr. Ulit was aware of Plaintiff's retinal tear in April, there

19  is no evidence that the delay in treatment caused Plaintiff further injury.  Throughout his opposition,

20  Plaintiff argues that Dr. Ulit's treatment was negligent.  As noted, mere indifference or negligence

21  does not support a cause of action for deliberate indifference under the Eighth Amendment.

22  Broughton, 622 F.2d at 460 .  In order to defeat Defendant's motion, Plaintiff must come forward

23  with evidence that establishes deliberate indifference.  Plaintiff has failed to do so.  Judgment

24  therefore should  be entered in favor of Dr. Ulit.

25      Accordingly, IT IS HEREBY RECOMMENDED that Defendant's motion for summary

26  judgment be granted, and judgment be entered in favor of Defendant and against Plaintiff.

27      These findings and recommendations are submitted to the United States District Judge

28  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days

1  after being served with these findings and recommendations, any party may file written objections

2  with the court and serve a copy on all parties.  Such a document should be captioned "Objections to

3  Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served

4  and filed within ten days after service of the objections.   The parties are advised that failure to file

5  objections within the specified time waives all objections to the judge's findings of fact.  See Turner

6  v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).  Failure to file objections within the specified time may

7  waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8

9

10

11

12      IT IS SO ORDERED.

13   **Dated:    March 16, 2012**              **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28